[Nos. D009161, D009135. Fourth Dist., Div. One. June 6, 1989.]

BUILDING INDUSTRY ASSOCIATION OF SAN DIEGO et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
CITY OF OCEANSIDE et al., Real Parties in Interest.

Counsel

Milch & Wolfsheimer, James S. Milch, Louis M. Wolfsheimer, Solomon, Ward, Seidenwurm & Smith, William O. Ward III, Worley, Schwartz, Garfield & Rice and Donald R. Worley for Petitioners.

Ronald A. Zumbrun, Edward J. Connor, Jr., Sharon L. Browne and John M. Groen as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Charles R. Revlett, City Attorney, Freilich, Stone, Leitner & Carlisle, Katherine E. Stone, Deborah J. Fox and Margaret A. Sohagi for Real Parties in Interest.

See appendix, page 298, for list of Amici Curiae on behalf of Real Parties in Interest.

OPINION

**TODD, J.**—In these consolidated petitions for writ of mandate, Del Oro Hills, a California general partnership, and Building Industry Association of San Diego, a California nonprofit corporation (collectively, BIA), in connection with their consolidated actions for declaratory and injunctive relief, seek to compel the San Diego County Superior Court to grant their motions for summary judgment and enjoin enforcement by the City of Oceanside (City) of a residential growth control measure enacted by initiative April 21, 1987, and known as ballot Proposition A and Chapter 32A, City of Oceanside Municipal Code (Prop. A or Ch. 32A). The essentially identical petitions and points and authorities in support of the petitions of BIA challenge the validity of Ch. 32A on the basis the measure conflicts with City's general plan and with state planning and zoning law. (See Gov. Code, § 65000 et seq.) BIA does not challenge Ch. 32A on the basis it has no "*real and substantial* relation to the public welfare" (*Associated Home Builders etc., Inc.* v. *City of Livermore* (*Livermore*) (1976) 18 Cal.3d 582, 609 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; *Miller* v. *Board of Public Works* (1925) 195 Cal. 477, 490 [234 P. 381, 38 A.L.R. 1479]), i.e., that the measure is invalid as an arbitrary and capricious exercise of the police power. Joining the parties are amici curiae taking City's position, including the City of Riverside, whose brief is joined in by numerous public entities, and amici curiae taking BIA's position, Pacific Legal Foundation,

People for Affordable Housing, the Urban League of San Diego, San Diego County Taxpayers Association and Hispanic Bankers Association.

Evidence Code section 669.5 played a role in the trial court's decision. Generally, Evidence Code section 669.5 provides there is a presumption that measures such as Ch. 32A, which directly limit, by number, the building permits that may be issued for residential construction or the buildable lots which may be developed for residential purposes, are presumed "to have an impact on the supply of residential units available in an area" (subd. (a)), and the section imposes on the City the burden to prove "the ordinance is necessary for the protection of the public health, safety, or welfare of the population of the city" (subd. (b)). In ruling on the parties' cross-motions for summary adjudication of issues and BIA's motion for summary judgment, the trial court applied the Evidence Code section 669.5, subdivision (a), presumption.[1]

At an October 14, 1988, hearing on the motions, after referring to its tentative ruling and the rationale it sets forth, the court stated that the City did not carry its rebuttal burden by presenting San Diego Association of

[1] Effective January 1, 1988, Evidence Code section 669.5 was amended in a manner not directly relevant to the issues in this case. (Stats. 1988, ch. 541, § 1.) Section 669.5 reads:

"(a) Any ordinance enacted by the governing body of a city, county, or city and county which (1) directly limits, by number, the building permits that may be issued for residential construction or the buildable lots which may be developed for residential purposes, or (2) changes the standards of residential development on vacant land so that the governing body's zoning is rendered in violation of Section 65913.1 of the Government Code is presumed to have an impact on the supply of residential units available in an area which includes territory outside the jurisdiction of the city, county, or city and county.

"(b) With respect to any action which challenges the validity of an ordinance specified in subdivision (a) the city, county, or city and county enacting the ordinance shall bear the burden of proof that the ordinance is necessary for the protection of the public health, safety, or welfare of the population of the city, county, or city and county.

"(c) This section does not apply to state and federal building code requirements or local ordinances which (1) impose a moratorium, to protect the public health and safety, on residential construction for a specified period of time, if, under the terms of the ordinance, the moratorium will cease when the public health or safety is no longer jeopardized by the construction, (2) create agricultural preserves under Chapter 7 (commencing with Section 51200) of Part I of Division 1 of Title 5 of the Government Code, or (3) restrict the number of buildable parcels or designate lands within a zone for nonresidential uses in order to protect agricultural uses as defined in subdivision (b) of Section 51201 of the Government Code or open-space land as defined in subdivision (b) of Section 65560 of the Government Code.

"(d) This section shall not apply to a voter approved ordinance adopted by referendum or initiative prior to the effective date of this section which (1) requires the city, county, or city and county to establish a population growth limit which represents its fair share of each year's statewide population growth, or (2) which sets a growth rate of no more than the average population growth rate experienced by the state as a whole. Paragraph (2) of subdivision (a) does not apply to a voter-approved ordinance adopted by referendum or initiative which exempts housing affordable to persons and families of low or moderate income, as defined in Section 50093 of the Health and Safety Code, or which otherwise provides low- and moderate-income housing sites equivalent to such an exemption."

Governments (SANDAG) documentation, described as "Series 6," covering the 1985 to 1991 time period and concerning regional housing needs assessments and City's share of those numbers, as well as declarations containing figures showing numbers of residential building permits issued before and after the April 1987 adoption of Ch. 32A. The last date covered by the figures was December 31, 1987. Instead, the court found that City showed there was an issue of material fact in connection with the Evidence Code section 669.5 presumption and its rebuttal and on that ground denied the motion.[2]

In any event, on BIA's motion the trial court found on issue 1 that Chapter 32A is a zoning ordinance within the meaning of Government Code section 65860, subdivision (a). This decision made BIA's issue number 2 moot. Moreover, the trial court found triable issues of material fact on BIA's issues numbered 3 and 5 through 9 separately setting out asserted conflicts between Ch. 32A and City's general plan (issue 3) as well as Government Code sections 65589.5 (issue 5), 65581, subdivision (d), (issue

---

[2] Neither the record nor the parties' references to it are clear. (See, e.g., petitioners' references to exhibit O, page 6, regarding supposed trial court ruling in transcript (BIA petition, p. 16, fn. 47; Del Oro Hills petition, p. 16, fn. 46); City's citation to a blank face sheet as showing specific changes in land use element (City's opposition, p. 43, lines 2 and 3, citing BIA's Appendix, Exhibit A, p. 314).) We met only partial success in our effort to clarify the record by requesting correct copies of the trial court's tentative ruling and City's motion for summary adjudication of issues in order to give meaning to the trial court's references to its rationale in the tentative ruling and to issues by number. It appears the court was speaking to City's motion concerning five issues, not before us in this proceeding, when it said: "The Court: With respect to issues one, three, four and five, the court will adopt as its ruling the tentative ruling which has already been submitted to counsel, as well as the rational [*sic*] set forth in that tentative ruling with respect to those four issues.

"In addition, I would like to make the following comments at this time: that the court is persuaded that there just has been an insufficient showing by way of evidence to establish the absence of the presumed fact, i.e., the regional housing impact, which is the presumed fact in subsection a of the statute. Simply put, Sandag series six numbers, in and of themselves, can't carry the rebuttal burden in this case even for the period of 1985 to 1991.

"I'm particularly persuaded by Mr. Worley's [counsel for Del Oro Hills] arguments with respect to lack of flexibility, and that's not to say at a full-blown evidentiary trial that they will not be sufficient; but for purposes of summary judgment they are insufficient. Beyond that, certainly, there's nothing in final form that addresses the period of 1991 through 1999. So the tentative ruling will stand with respect to issues one, three, four, and five.

"Issue two will be addressed or determined at a later time."

Soon thereafter the court went on to state: "The tentative ruling with respect to issue number two and the City's summary adjudication of issues as to all five cases will also be adopted as the ruling of the court."

The tentative ruling denied summary adjudication of all five of City's issues, which were:

"1. Proposition A will not adversely impact the supply of housing in the region.

"2. The City has rebutted that presumption created by Evidence Code Section 669.5.

"3. At trial Proposition A will be presumed valid and plaintiff will bear the burden of proving that it is not fairly debatable that Proposition A is reasonably related to the public health, safety or welfare.

"4. Proposition A is not a zoning ordinance that authorizes land uses.

"5. Government Code Section 65860 is not applicable to Proposition A."

6), 65358, subdivision (a) and 65588 (issue 7), 65583, subdivision (c), (issue 8), and 65913, 65913.4, 65915 and 65917 (issue 9). On BIA's issue number 10 challenging Ch. 32A on the ground it conflicts with the statewide scheme the trial court also found triable issues of material fact.

In addition, on BIA's motion for summary judgment on issue number four of BIA's motion, whether Ch. 32A "[i]s inconsistent with the City of Oceanside's General Plan, that Inconsistency Must at Least Give Rise to a Presumption that It Does Not Reasonably Relate to the Community's General Welfare, and Therefore Constitutes an Abuse of the City's Police Power," the trial court stated, in part: "I think BIA is correct and has eloquently argued that Proposition A 'appears,' and I put quotes around the word 'appears' to be facially inconsistent with the City's adopted general plan. Especially the PFME, the Public Facilities Management Element. [*sic*] As well as the low and moderate income housing fair share allocation for the City.

"However—the City has, at this particular point in time—barely successfully rebutted this facial inconsistency sufficient to raise issues, that is, triable issues of material fact as to Prop A's implementation based upon the materials set forth in the tentative ruling as well as in opposition to a facial attack; that is a facial attack vis-à-vis the statutes, the general law statutes in the area. [*sic*] As well as the City's general plan. So, that portion of the tentative ruling will be confirmed."

In its tentative ruling the court first overruled objections to certain declarations and to BIA's standing to sue. On the standing issue the court relied on *Construction Ind. Ass'n, Sonoma Cty.* v. *City of Petaluma* (9th Cir. 1975) 522 F.2d 897, 903-905. The court proceeded to deny BIA's motion for summary judgment finding "the question of consistency is a material triable issue of fact per the *Turlock* case. [149 Cal.App.3d 584.] . . . . Further, the court finds disputed facts per supplemental declarations of Blessing, paragraph 10, lines 22-28 (regional housing), and Dyett declaration, paragraph 9, lines 11-14 (PFME)."

In a June 16, 1988, declaration of City Planner, Michael J. Blessing, he states at paragraph 10, lines 22 to 28: "10. During 1987 a total of 1,098 residential units were determined to be excepted from the ordinance pursuant to Section 32A.2(f) and (g). In the second year that the Residential Development Control System was in operation (January 1, 1988 to June 14, 1988) a total of 1,981 residential units were determined to be excepted from the ordinance pursuant to Section 32A.2(f) and (g)."

An attachment to this declaration contains figures which indicate that through the third week of December 1987, City issued a total of 6,278 building permits for a total of 4,673 single family and multiple residential

units. These figures compare with those shown on the attachment for the two immediately preceding years, 1986 and 1985, which involved, respectively, 3,693 and 3,844 building permits for total residential units numbering, respectively, 2,351 and 2,724.

A declaration dated September 6, 1988, by Michael V. Dyett, a regional planning consultant who in 1979 assisted in drafting the Public Facilities Management Element (PFME) of City's general plan, states in paragraph 9, lines 11 to 14 (referred to by the trial court): "9. I have read and am thoroughly familiar with the managed growth system, commonly known as Prop. A, adopted by the voters of the City of Oceanside on April 21, 1987 and I am of the opinion that Prop. A is consistent with the PFME."

Thus, the trial court denied BIA's summary judgment motion on the basis City successfully showed there are triable issues of material fact necessary to be determined in order to resolve the question whether there is facial inconsistency between Ch. 32A and City's general plan, on the one hand, and state laws, on the other. A corollary of this conclusion is that under state law, including the planning and zoning law and Evidence Code section 669.5, the matter of conflict between a numerical growth control ordinance such as we deal with here and state law or a general plan cannot be determined without reference to facts relating to a local entity's compliance with its obligation to meet its share of regional housing needs. This corollary is the primary issue in the case.

Generally, the thrust of City's position was and is that Ch. 32A is not inconsistent or in conflict with its general plan or state law and that since the enactment of Ch. 32A City has complied and will comply with its fair share of regional housing needs as established by SANDAG. Though it has not petitioned for a writ, City challenges the trial court's rulings in BIA's favor that Ch. 32A is a zoning ordinance, and that BIA has standing to challenge Ch. 32A independent of the remedies provided by Government Code sections 65750 to 65763 which City argues are BIA's exclusive remedies.

As mentioned, BIA seeks a writ of mandate on the ground there is only presented in this case a question of law involving the facial inconsistency of Ch. 32A with City's general plan and state law.

For reasons described below, relating significantly to the Legislature's recognition of the role of local entities in land use planning and zoning and its enactment of a special evidentiary statute pertaining to litigating the validity of numerical growth limitation measures such as we consider here, we deny the writ of mandate.

## FACTS

Ch. 32A, adopted by the Oceanside electorate in April 1987, declares one of its purposes is "to augment the policies of the City as recorded in the General Plan and City ordinances relating to the regulation of residential development," and "[i]n order to accomplish this purpose, the City must be able to control the rate, distribution, quality and economic level of proposed development on a year to year basis." Ch. 32A adopts a "Residential Development Control System" (RDCS) which, with what may be significant exceptions, adopts a maximum number of dwelling units to be constructed each year, called annual allotments. The allotments are 1,000 for 1987 and 800 for each year thereafter until December 31, 1999, with power granted to the City Council to modify the annual allotment by an amount no greater than 10 percent more or less for any given year and a requirement the annual allotment for a next succeeding year be adjusted higher or lower in order to redress any excess or deficit in the preceding year. Excepted from the RDCS are the following: "(a) Projects of not more than four residential dwellings, limited to only one such project per developer per calendar year.

"(b) Fourplexes or less numbered multiple dwellings on a single existing lot.

"(c) Single family residential units on a single existing lot.

"(d) Rehabilitation or remodeling of an existing dwelling, or conversion of apartments to condominiums, so long as no additional dwelling units are created.

"(e) Units within the legally designated redevelopment project area.

"(f) Those specific Units which are formally dedicated for occupancy by low income persons or senior citizens pursuant to the provisions of applicable federal, state, or local laws or programs provided these types of units are spread equitably throughout the city and not concentrated in one neighborhood. For the purposes of this section, a project is funded or subsidized pursuant to applicable federal, state or local laws or programs if it receives a loan, grant or continuing financial subsidy for the purpose of developing low-income or senior citizen housing units. This section does not exempt low income or senior citizen projects built with density bonuses or other development considerations under any program.

"(g) Single family dwelling unit projects with lots an average of which are 10,000 square feet or better, which can achieve a minimum of 70% or better, of the maximum awardable points using the Residential Development Evaluation System are exempt."

Ch. 32A, in addition, provides for application, evaluation and award of development allotments which must be granted before a building permit may be issued. The measure contains other provisions not particularly relevant to this case.

When the trial court considered the motions for summary judgment, it had before it certain documents that tended to show the numbers of the regional housing needs established by SANDAG for the period July 1985 to July 1991 (Series 6) and earlier periods, as well as City's record of building permits through December 1987 in conjunction with City's efforts pursuant to the role it accepted in fulfilling regional housing needs established by SANDAG.

Since the hearing in the trial court, accompanying City's opposition to the petitions for writ of mandate, City has filed additional declarations and exhibits.[3] City's exhibits, if accepted as factual, among other things tend to show at least for the period up to 1991 it is probable City will fulfill its fair share of regional housing needs for low income housing. City lists 12 housing assistance programs for low and moderate income families which are detailed in the housing element of its general plan. City's exhibits and declarations show actions City has taken since the hearing such as accepting SANDAG's Series 7 population forecast to year 2010 of 172,700 Oceanside residents and accepting for monitoring purposes SANDAG's five-year housing unit forecast for the period January 1, 1989, to January 1, 1994. City's exhibits also indicate City is preparing to replace the PFME of its general plan with a community facilities element which will not contain a

---

[3] BIA objects to the admission of some of this material submitted for the first time to this court as a reviewing court (Code Civ. Proc., § 437c, subd. (*l*)). BIA relies on California Rules of Court, rule 56 (c)(2) and (3), providing in part that the petition seeking "review of a trial court ruling shall be accompanied by a record adequate to permit review of the ruling, including: [¶] (2) copies of all documents and exhibits submitted to the trial court supporting and opposing petitioner's position; [¶] (3) copies of all other documents submitted to the trial court that are necessary for a complete understanding of the case and the ruling; . . ." BIA cites no other authority for its objection.

Rule 56 (c)(2) and (3) merely sets forth parts of the minimum record required to accompany the petition seeking review of a trial court ruling. It does not purport to limit the record to the items mentioned. Since we are considering the legal question of whether an issue of material of fact exists for purposes of testing the propriety of the denial of a summary judgment, and we are not acting as a fact finder or casting any judgment on the authenticity of the materials, it is appropriate to consider the additional declarations and exhibits City submitted with its opposition.

The same conclusion applies to the materials in City's May 2, 1989, supplemental request for judicial notice which we informed counsel we intended to grant subject to counsel addressing this question at oral argument.

For similar purposes and reasons, we take into consideration certain citations, declarations and exhibits submitted by BIA but objected to by City.

We note the trial court granted all of the parties' requests for judicial notice except BIA's request for judicial notice of a Los Angeles Superior Court trial result.

provision that one of its eleven major policies is to "[a]void direct controls on the number or location of new housing units to be built, but provide financial incentives for projects where services can be provided to new and old residents at least cost." This statement of policy in the PFME is a primary basis of BIA's argument there is facial inconsistency between Ch. 32A and City's general plan.

City's opposition describes the housing needs portion of the state's planning and zoning law and applies some of its declarations and exhibits as follows: "The statutory scheme referred to by the Building Industry in its complaint is set forth in Article 10.6 of Chapter 3 of the Government Code (§§ 65580 *et seq.*). Article 10.6 was adopted in 1980 (AB 2853 [Roos]) in response to the regional welfare concerns articulated by the Supreme Court in *Associated Home Builders of Greater Eastbay, Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, and lobbying efforts by various groups concerned with affordable housing.

"The statutory scheme sets forth the basic criteria and methodology for assessing and allocating regional housing needs. The process begins with state population forecasts that are divided among regions. The regional council of governments (SANDAG) then performs a regional housing needs assessment and allocates to each local jurisdiction a portion of the region's housing needs. (Govt. Code § 65584.)

"Although a local jurisdiction does *not* have to accept the numbers assigned to it by SANDAG, for the current period July 1, 1985 through July 1, 1991 (SANDAG's 'Series 6'), Oceanside and every other jurisdiction in the region did accept SANDAG's regional needs assessment numbers. (Blessing Decl., ¶ and McLaughlin Decl., ¶ 5.) Oceanside's share of regional housing needs is 10,397 residential units through 1991. (Blessing Decl., ¶ 15.) Each jurisdiction is also asked to assume its fair share of providing assisted housing for lower income households. SANDAG determined that only programs for low income households needed to be contained in the housing elements for each jurisdiction for Series 6 that period because housing for all other income was available at market rate in the region. Oceanside's goal, as determined by SANDAG and set forth in its housing element, is to provide assistance for 693 lower income households between 1986 and 1991. (BIA's App., Vol. 1, Exh. A, p. 0282; Goodman Decl., ¶ 4; McLaughlin Decl., ¶ 4 and Exh. 57.)

"Regional growth forecasting and allocating regional housing needs in accordance with the statutory criteria is a complicated, time-consuming process. SANDAG is now in the process of preparing its Series 7 regional housing needs assessment based on the Series 7 growth forecast. Oceanside's share of the projected regional population growth for the Series 7 period is

7,934 units (approximately 1,587 units per year). Oceanside has accepted SANDAG's Series 7 numbers and has indicated it will be able to accommodate that number and will use those numbers for its next housing element revision for the period 1990-1995. (Blessing Decl., ¶¶ 25 and 26, Exh. 53 and Exh. 54 and Govt. Codes §§ 65584, 65585, 65588.)" (Fns. omitted.)

BIA concedes City's housing element of its general plan, as revised in 1985, "constitutes a consistent, comprehensive guideline and statement for meeting the regional housing need, as determined by the RHNS, in a manner required pursuant to Government Code Section 65580 *et seq.*" The housing element which is revised at least once every five years details specific policies and programs to attain its goal and objectives which are:

"COMPREHENSIVE HOUSING GOAL

"It is the goal of the citizens of the City of Oceanside:

"To ensure that decent, safe, and sanitary housing is available to all current and future residents of the community at a cost which is within the reach of the diverse economic segments which comprise this community. To this end, the City will strive to maintain a reasonable balance between rental and ownership housing opportunities between senior and family housing and encourage a variety of individual choices of tenure, type, and location of housing throughout the community.

"OBJECTIVES

"1. The City shall strive to produce opportunities for decent and affordable housing in a pleasant environment for all of Oceanside's citizens.

"2. The City shall ensure that housing is developed in areas with adequate access to employment opportunities, community facilities and public services.

"3. The City shall encourage development of a variety of housing opportunities, with special emphasis on providing:

"a. A broad range of housing types, with varied levels of amenities and number of bedrooms.

"b. Sufficient rental stock for all segments of the community, including families with children.

"c. Housing which meets the special needs of the elderly and the handicapped.

"4. The City shall protect, encourage and, where feasible, provide housing opportunities for persons of low and moderate income."

City's housing section in its community values article of the land use element of its general plan has as its objective "[t]o ensure that decent, safe and sanitary housing is available to all current and future residents of the community at a cost which is within the reach of the diverse economic segments of Oceanside." For implementation of this objective the section refers to the housing element of the general plan.

## DISCUSSION

Initially, we point out that we issued an order to show cause in this case because of its apparent significance in light of the increasing frequency with which numerical growth control ordinances are being adopted, thus impacting available residential housing, and in recognition of the Legislature's declaration "[t]he availability of housing is of vital statewide importance, and the early attainment of decent housing and a suitable living environment for every California family is a priority of the highest order." (Gov. Code, § 65580, subd. (a).)[4]

It must be emphasized early on as well that in this proceeding we do not act as a fact finder. Rather, we consider only a question of law in the context of the arguments BIA presents and we do so pursuant to established rules pertaining to motions for summary judgment. ■ Basic rules for considering a summary judgment motion are aptly stated as follows: "A motion for summary judgment 'shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).) The purpose of summary judgment is to penetrate evasive language and adept pleading and to ascertain, by means of affidavits, the presence or absence of triable issues of fact. . . . Accordingly, the function of the trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves. . . .

"Summary judgment is a drastic measure that deprives the losing party of a trial on the merits. . . . It should therefore be used with caution, so that it does not become a substitute for trial. . . . The affidavits of the moving party should be strictly construed, and those of the opponent liberally construed. . . . Any doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. . . ." (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46], citations omitted.)

■ The legal question here is whether it can be determined without reference to resolution of material factual issues that Ch. 32A conflicts with

---

[4] City agrees with BIA's assessment that this case presents important questions of law, early resolution of which would have widespread benefits.

either or both City's general plan and state planning and zoning law. Considering such matters as the exceptions in Ch. 32A for segments of housing needs that may well encompass numbers of housing units in each segment that are within City's fair share of regional housing needs, and considering the scheme of state law which provides for revision of each locality's share of the regional housing needs at five-year intervals and which specifically precludes reduction of the determined share based on enactment of a numerical growth control ordinance (Gov. Code, § 65584, subds. (a) and (d)(1)),[5] we have concluded that invalidity of such an ordinance can be established only by determining facts bearing on whether the enactment truly conflicts with state law and its purposes. Apparent partial inconsistency with portions of a general plan or state law will not alone suffice to render a numerical growth control ordinance invalid.

■ Ordinances such as Ch. 32A "are presumed to be constitutional, and come before the court with every intendment in their favor." (*Livermore, supra,* 18 Cal.3d 582, 604-605.) *Livermore* continues (at p. 605): " 'The courts may differ with the zoning authorities as to the "necessity or propriety of an enactment," but so long as it remains a "question upon which reasonable minds might differ," there will be no judicial interference with the municipality's determination of policy.' (*Clemons* v. *City of Los Angeles* (1950) 36 Cal.2d 95, 98 [222 P.2d 439].) In short, as stated by the Supreme Court in *Euclid* v. *Ambler Co., supra,* 'If the validity . . . be fairly debatable, the legislative judgment must be allowed to control.' (272 U.S. 365, 388 [71 L.Ed. 303, 311].)"

Operating in conjunction with the rule of presumed validity of ordinances of this type are rules giving special deference to measures adopted by use of the initiative process.

■ " ' "[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right be not improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it." ' " (*Building Industry Assn.* v. *City of Camarillo (Camarillo)* (1986) 41 Cal.3d 810, 821 [226

[5] Government Code section 65584, subdivisions (a) and (d), provide in part: "(a) . . . Each locality's share shall be determined by the appropriate council of governments consistent with the criteria above with the advice of the department subject to the procedure established pursuant to subdivision (c) at least one year prior to the second revision, and at five-year intervals following the second revision pursuant to Section 65588.

". . . . . . . . . . . . . . . . . .

"(d)(1) Except as provided in paragraph (2), any ordinance, policy, or standard of a city, county, or city and county which directly limits, by number, the building permits which may be issued for residential construction, or which limits for a set period of time the number of buildable lots which may be developed for residential purposes, shall not be a justification for a determination or a reduction in a local government's share of the regional housing need. . . ."

Cal.Rptr. 81, 718 P.2d 68], quoting *Livermore, supra,* 18 Cal.3d at p. 591.) ■ Pertinent to this case is the holding of *Camarillo* that application of Evidence Code section 669.5 to numerical growth control initiative measures is not an unconstitutional impediment to the initiative process. (*Id.* at pp. 822-823.)

■ Another major factor in support of Ch. 32A and the conclusion we reach is that substantial compliance with state law is the test applicable to enactments such as Ch. 32A. (*Buena Vista Gardens Apartments Assn.* v. *City of San Diego Planning Dept.* (1985) 175 Cal.App.3d 289, 297-298 [220 Cal.Rptr. 732].) The question of substantial compliance is one of law and thus the reviewing court need not give deference to the conclusion of the trial court. (*Ibid.*)

While it is clear that making housing available to every Californian is a statewide policy of the highest priority (Gov. Code, § 65580, subd. (a)) and that numerical growth control ordinances presumptively impact on the supply of residential units available in a region, the scheme of law pertaining to this area of government endeavor recognizes the importance of local government participation. (*Bownds* v. *City of Glendale* (1980) 113 Cal.App.3d 875, 880 [170 Cal.Rptr. 342], "The statutes make clear, however, that local control is at the heart of [the planning and zoning] process.") The California Constitution, of course, empowers a general law city such as Oceanside to "make and enforce within its limits all local police, sanitary and other ordinances not in conflict with general laws." (Cal. Const., art. XI, § 7.) More specifically, however, provisions such as Government Code sections 65580 and 65581 leave no doubt that the front line role in land use planning and zoning is in the hands of the local government. Those sections read: "65580. The Legislature finds and declares as follows: [¶] (a) The availability of housing is of vital statewide importance, and the early attainment of decent housing and a suitable living environment for every California family is a priority of the highest order.

"(b) The early attainment of this goal requires the cooperative participation of government and the private sector in an effort to expand housing opportunities and accommodate the housing needs of Californians of all economic levels.

"(c) The provision of housing affordable to low- and moderate-income households requires the cooperation of all levels of government.

"(d) *Local* and state *governments have a responsibility to use the powers vested in them to facilitate the improvement and development of housing to make adequate provision for the housing needs of all economic segments of the community.*

"(e) The Legislature recognizes that in carrying out this responsibility, each *local government also has the responsibility to consider economic, environmental, and fiscal factors and community goals set forth in the general plan and to cooperate with other local governments and the state in addressing regional housing needs.*" (Italics added.)

"65581. It is the intent of the Legislature in enacting this article:
"(a) To assure that *counties and cities recognize their responsibilities in contributing to the attainment of the state housing goal.*

"(b) To assure that *counties and cities will prepare and implement housing elements which, along with federal and state programs, will move toward attainment of the state housing goal.*

"(c) To recognize that *each locality is best capable of determining what efforts are required by it to contribute to the attainment of the state housing goal, provided such a determination is compatible with the state housing goal and regional housing needs.*

"(d) To ensure that each local government cooperates with other local governments in order to address regional housing needs." (Italics added.)

In enacting Evidence Code section 669.5 and placing presumptive and burden of proof limitations on the exercise of certain of local government's land use powers when challenged in court, the Legislature nevertheless recognized the continuing authority of local governments to exercise these powers only in a manner consistent with a proper respect for regional housing needs. The Legislature expressly recognizes that in certain instances the public health, safety and welfare may warrant the enactment of ordinances which restrict the number of housing units that may be built.[6] It is to be noted that the Evidence Code section does not purport to preempt or invalidate numerical growth control ordinances. Rather, it subjects ordinances to which it applies to a presumption of impact on the housing supply and places on the local entity a new burden of proof to establish the "ordinance is necessary for the protection of the public health, safety, or welfare of the population of" the local entity. (Evid. Code,

---

[6] When it enacted Evidence Code section 669.5, the Legislature provided: "SECTION 1. The Legislature finds and declares that an adequate supply of housing is necessary for the health, safety, and public welfare of all Californians. The Legislature further finds and declares that local government *ordinances which severely restrict the number of housing units which may be constructed have an effect on the supply of housing within the region, may exacerbate the housing market conditions in surrounding jurisdictions, and may limit access to affordable housing within the jurisdiction and in the region. While the Legislature recognizes that, in certain instances, the public health, safety, and welfare warrant enactment of such ordinances, increasing public need for adequate housing requires that local governments properly establish the need for such ordinances and balance the need for such ordinances against the need for new housing opportunities.*" (Stats. 1980, ch. 1144, § 1, italics added.)

§ 669.5, subd. (b); cf. *Livermore, supra,* 18 Cal.3d at p. 609, "The burden rests with the party challenging the constitutionality of an ordinance to present the evidence and documentation which the court will require in undertaking this constitutional analysis.")[7]

It should be noted that under the ruling of *Livermore* as to burden of proof and in the context of the police power attack on the controlled growth ordinance there involved (generally prohibiting issuance of any building permits until sufficient public facilities are provided), the court identified factual issues that needed resolution before the validity of the ordinance could be determined. (*Livermore, supra,* 18 Cal.3d at p. 610, "[There was] presented no evidence to show the likely duration or effect of the ordinance's restriction upon building permits. . . . to show whether the city and such agencies have undertaken to construct the needed improvements or when such improvements will be completed. . . . [¶] . . . *Without an evidentiary record to demonstrate the validity and significance of the asserted interests, we cannot determine whether the instant ordinance attempts a reasonable accommodation of those interests.*" (Italics added.)) It occurs to us that although the asserted claims in this case are of a different nature from those in *Livermore,* the same inability to determine those claims without reference to determined facts exists here. For example, whether the regional housing needs as established by SANDAG are and will be met under the enactment of Ch. 32A is a question of material fact that awaits proof.

With respect to the matter of whether there is a question of fact, *Guardians of Turlock's Integrity* v. *Turlock City Council* (1983) 149 Cal.App.3d 584, 598 [197 Cal.Rptr. 303], states: "We find that the decision as to whether a particular project is consistent with a general plan involves 'the application of standards . . . to individual parcels' which renders that decision adjudicatory, and thus subject to the substantial evidence test on judicial review. [Citation.]" ■ Without engaging in the parties' dispute as to the nature of this statement as dictum or holding, we must find it is supportive of the conclusion that a question of consistency as between an ordinance and state law or a general plan involves the need to make factual determinations.

Under rules relating to summary judgment motions, the conclusion there are issues of fact to be determined precludes the granting of the motion. (See *Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d at p. 1107.) Considering the

---

[7] The purpose of Evidence Code section 669.5 "is to support the public policy favoring construction of affordable housing." (*Camarillo, supra,* 41 Cal.3d 810, 820.) The section "simply shifts to the local government the burden of proving that the growth control ordinance is necessary for the protection of the public health, safety, or welfare if the ordinance is challenged." (*Id.* at p. 822.)

scheme of law that makes the matter of consistency ever subject to revision and dependent upon the changing housing needs of a region, we conclude the matter of conflict between a numerical growth control ordinance such as Ch. 32A and a general plan or state laws, or both, must await determination of the underlying facts.

The same conclusion attends City's assertion that it "has shown with undisputed evidence, [sic] that Prop. A does not operate to restrict Oceanside from accommodating its fair share of the region's housing needs," and thus has rebutted the Evidence Code section 669.5 presumption of impact on the supply of residential units available in the region. Such a conclusion awaits a determination of facts, some of which by necessity will have to be projections of the reasonable probability of accommodating regional housing requirements to the year 2000.[8]

We have considered the checklist of 12 asserted conflicts which BIA presents and the support for its conclusions found in BIA's points and authorities in support of its motion for summary judgment. We find the arguments unmeritorious without reference to established facts. Moreover, the arguments are unconvincing and lack merit in certain other respects.

For example, BIA's first point that Ch. 32A "limits construction of projects subject to its authority to a fixed, non-revisable, number of units per year for 12 years" is not correct in light of the exceptions in the measure for various forms of housing not subject to the limits. Another example is BIA's assertion of conflict between Ch. 32A and Government Code section 65589.5[9] because Ch. 32A "authorizes the CITY to withhold building permits which meet all of the requirements established by the various elements of the General Plan, without requiring findings. . . . PROPOSITION A re-

---

[8] Since BIA is challenging Ch. 32A on the bases of conflict and preemption and not on a theory there is no reasonable relationship between the ordinance and the public health, safety or welfare, it is apparent at this stage of the proceedings the burden of proof provision of Evidence Code section 669.5, subdivision (b), plays no role in the determinations made and to be made.

[9] Government Code section 65589.5 provides: "When a *proposed housing development project complies* with the applicable general plan, zoning, and development policies in effect at the time that the housing development project's application is determined to be complete, *but the local agency proposes to disapprove the project or to approve it upon the condition that the project be developed at a lower density,* the local agency shall base its decision regarding the proposed housing development project upon written findings supported by substantial evidence on the record that both of the following conditions exist: (a) The housing development project would have a specific, adverse impact upon the public health or safety unless the project is disapproved or approved upon the condition that the project be developed at a lower density.

"(b) There is no feasible method to satisfactorily mitigate or avoid the adverse impact identified pursuant to subdivision (a), other than the disapproval of the housing development project or the approval of the project upon the condition that it be developed at a lower density." (Italics added.)

quires no such findings." In the first place Ch. 32A does not address itself to any specific "proposed housing development project" as to which the City has proposed to disapprove or to condition its approval on lower density development. Moreover, in the event Government Code section 65589.5 comes into play with respect to a particular proposed development project, there is nothing in Ch. 32A that would prevent the City from making the findings under the section. The fact Ch. 32A omits a requirement of findings does not preclude the City from complying with Government Code section 65589.5 when the section becomes applicable. In no event does that omission make Ch. 32A "contrary to Section 65589.5," as BIA asserts.[10]

Due to a similar lack of merit in BIA's other arguments of conflict, we deem it unnecessary to address them seriatim.

■ On the matter of preemption, however, it is clear from the numerous statutes delegating local entities as the front line functionaries in the area that no state preemption precluding enactment of ordinances such as Ch. 32A is present in the field. There is in this scheme of Law "no legislative indication of 'a paramount state concern [which] will not tolerate further or additional local action.'" (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 142 [130 Cal.Rptr. 465, 550 P.2d 1001], quoting *In re Hubbard* (1964) 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809].) In fact, the contrary is true. (See Evid. Code, § 669.5; Stats. 1980, ch. 1144, § 1, quoted at fn. 6, *ante*; Gov. Code, § 65584, subd. (d)(1), legislation recognizing the authority of local entities to enact numerical growth control measures.) In *Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491, 504 [247 Cal.Rptr. 362, 754 P.2d 708], the Supreme Court, albeit not in the context of a decision on preemption,[11] recognizes "ballot measures may be used to enact or amend zoning ordinances despite the language of [Government

---

[10] To the extent BIA may be arguing Ch. 32A is invalid because it does not contain findings pursuant to Government Code section 65589.5, the rationale of *Camarillo, supra,* 41 Cal.3d 810, 823-824, that legislative procedural requirements do not apply to measures passed by initiative, would pertain to this case. Thus, just as *Camarillo* held the weighing and balancing requirement of Government Code section 65863.6 is inapplicable to a growth control ordinance passed by initiative and will not operate to invalidate it, so also would the findings requirements of Government Code section 65589.5 not apply to or invalidate Ch. 32A. (See also *Livermore, supra,* 18 Cal.3d 582, 594, 596, holding notice and hearing provisions of Government Code sections 65853 through 65857 govern only ordinances enacted by city council and do not limit power of electors to adopt an initiative; *Lee* v. *City of Monterey Park* (1985) 173 Cal.App.3d 798, 807-808 [219 Cal.Rptr. 309], holding Government Code section 65302.8 requirement of findings for growth control amendment to general plan is inapplicable to growth control initiative.)

[11] The court was concerned with whether authority delegated to a "city council" or "board of supervisors" under Government Code section 66484.3 could be exercised by means of the initiative.

Code] sections 65850-65858 conferring zoning powers on the 'legislative body.' "[12]

■■■■■ The land use planning and zoning scheme of law with which we deal does not, under a theory of implied preemption (see *Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 292-293 [219 Cal.Rptr. 467, 707 P.2d 840]),[13] bar enactment of a numerical growth control ordinance by means of the initiative. (See *Livermore, supra,* 18 Cal.3d 582, 595, "Although the Legislature can specify the manner in which general law cities enact ordinances restricting land use, legislation which permits council action but effectively bars initiative action may run afoul of the 1911 amendment [to the California Constitution reserving the right of initiative on behalf of municipal voters (former Cal. Const., art. IV, § 1)]. [Fn. omitted.]") As in the case of the California Coastal Act (Pub. Resources Code, § 30000 et seq.), which contains "a comprehensive scheme to govern land use planning for the entire coastal zone of California" (*Yost* v. *Thomas* (1984) 36 Cal.3d 561, 565 [205 Cal.Rptr. 801, 685 P.2d 1152]), the state land use planning and zoning law "leaves wide discretion to a local government not only to determine the contents of its land use plans, but to choose how to implement these plans." (*Id.* at p. 573.)

The trial court granted BIA's motion for summary adjudication of issues on the question whether Ch. 32A is a zoning ordinance within the meaning

---

[12] In support of the quoted proposition, the court cites the following authorities and examples: "(*Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511 [169 Cal.Rptr. 904, 620 P.2d 565] [zoning initiative in general law city]; *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038] . . . [same]; *San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973] [zoning initiative in charter city]; *Johnston* v. *City of Claremont* (1958) 49 Cal.2d 826 [323 P.2d 71] [zoning referendum in general law city].)" (*Ibid.*) The court also states, "Similarly, adoption and amendment of a general plan may be the subject of initiative or referendum although section 65356 gives these powers to the 'legislative body.' (*Yost* v. *Thomas* (1984) 36 Cal.3d 561 [205 Cal.Rptr. 801, 685 P.2d 1152] [referendum on general plan amendment]; *O'Loane* v. *O'Rourke* (1965) 231 Cal.App.2d 774 [42 Cal.Rptr. 283] [referendum in general law city on resolution adopting general plan]; 66 Ops.Cal.Atty.Gen. 258 [initiative to amend general plan of general law county].)" (*Ibid.,* citations omitted where appropriate.)

[13] " 'In determining whether the Legislature has preempted by implication to the exclusion of local regulation we must look to the whole purpose and scope of the legislative scheme. There are three tests: "(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality." ' (*People* ex. rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 485 [204 Cal.Rptr. 897, 683 P.2d 1150], quoting *In re Hubbard, supra,* 62 Cal.2d at p. 128; accord *Galvan* v. *Superior Court, supra,* 70 Cal.2d [851] at pp. 859-860 [76 Cal.Rptr. 642, 452 P.2d 930].)" (*Cohen, supra,* 40 Cal.3d at pp. 292-293.)

of Government Code section 65860.[14] Although City challenges this ruling as incorrect, it has not petitioned for a writ. Under the circumstances we deem it inappropriate to address the correctness of the trial court's determination on this issue in these proceedings. We note, however, that even assuming the trial court was correct, Government Code section 65860, subdivisions (b) and (c), prescribe a remedy for effecting compliance and consistency between the zoning ordinance and general plan. (See *Neighborhood Action Group* v. *County of Calaveras* (1984) 156 Cal.App.3d 1176, 1187 [203 Cal.Rptr. 401].) A declaration of invalidity of the ordinance is not a prescribed remedy. Thus, any application of Government Code section 65860 to the case in connection with BIA's arguments of inconsistency or conflict between Ch. 32A as a zoning ordinance and the general plan's housing element and the PFME could result in a compliance decree, not a finding of invalidity. In view of this conclusion, the statement in *Sierra Club* v. *Board of Supervisors* (1981) 126 Cal.App.3d 698, 704 [179 Cal.Rptr. 261], that an inconsistent zoning ordinance was "invalid when passed" is of no consequence in this case. In *Sierra Club,* the general plan was determined to be internally inconsistent, thus making it impossible for *any* subordinate ordinance to be consistent with such a general plan. Such a theory is not advanced by BIA in this proceeding.

 It is readily apparent in the case before us that there is present no clear invalidity of Ch. 32A due to inconsistency with the general plan. As we have seen, factual determinations need to be made before the question of inconsistency can be resolved. In *deBottari* v. *City Council* (1985) 171 Cal.App.3d 1204, 1212 [217 Cal.Rptr. 790], the *Sierra Club* rule of "invalid when passed" was also stated. The basic factual situation in *deBottari* was

---

[14] Government Code section 65860 provides: "(a) County or city zoning ordinances shall be consistent with the general plan of the county or city by January 1, 1974. A zoning ordinance shall be consistent with a city or county general plan only if:
"(i) The city or county has officially adopted such a plan, and
"(ii) The various land uses authorized by the ordinance are compatible with the objectives, policies, general land uses, and programs specified in such a plan.
"(b) Any resident or property owner within a city or a county, as the case may be, may bring an action in the superior court to enforce compliance with the provisions of subdivision (a). Any such action or proceedings shall be governed by Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure. Any action or proceedings taken pursuant to the provisions of this subdivision shall be taken within 90 days of the enactment of any new zoning ordinance or the amendment of any existing zoning ordinance as to said amendment or amendments.
"(c) In the event that a zoning ordinance becomes inconsistent with a general plan by reason of amendment to such a plan, or to any element of such a plan, such zoning ordinance shall be amended within a reasonable time so that it is consistent with the general plan as amended.
"(d) Notwithstanding Section 65803, this section shall apply in a charter city of 2,000,000 or more population to a zoning ordinance adopted prior to January 1, 1979, which zoning ordinance shall be consistent with the general plan of such city by July 1, 1982."

that a repeal of the zoning ordinance there involved, if placed on the ballot as a referendum measure, "would result in the subject property being zoned for the low density residential use while the amended general plan calls for a higher residential density." Thus, in *deBottari* the court was concerned with a clear, immediate inconsistency between the zoning ordinance repeal which was the subject of the referendum, if adopted, and the amended general plan, resulting in the trial and appellate courts' refusing to order the referendum placed on the ballot. Since no such clear, immediate inconsistency between Ch. 32A and the general plan is involved here, *deBottari* furnishes no authority for invalidating Ch. 32A.

We conclude summary judgment was properly denied.

## DISPOSITION

Writs denied.

Work, Acting P. J., and Huffman, J., concurred.

A petition for a rehearing was denied June 27, 1989, and petitioner's application for review by the Supreme Court was denied August 17, 1989. Mosk, J., was of the opinion that the application should be granted.

## APPENDIX

William J. Adams, Michael Adamson, Manuela A. Albuquerque, Steven Amerikaner, Bryon D. Athan, Alvin W. Beardsley, Robert K. Booth, Jr., Robert R. Campagna, Robert Cornell, Joseph A. Forest, Robert A. Grable, Donald Greenberg, Jean Leonard Harris, Leland H. Jordon, Leroy W. Knutson, Philip D. Kohn, Robert J. Lanzone, David Larson, William C. Marsh, Michael D. Milich, Ronald E. Moe, Steven F. Nort, Jeffrey Oderman, Gary Ragghianti, Michael H. Roush, Susan Schectman, Judy Skousen, M. Dwain Smith, Allen E. Sprague, Carol B. Tanenbaum, Richard R. Terzian, Harvey Wallace, Charles Williams, Kenneth Wilson and John Woodhead, City Attorneys, James T. Morton, Town Attorney, Marvin Levin and Susan Roff, County Counsel, Stephen S. Stark and Jana Zimmer, Deputy County Counsel, and Debra A. Greenfield as Amici Curriae on behalf of Real Parties in Interest.